**UNITED STATES**

v.

**Harold J. FLOWERS, 505 72 0490, Electronics Technician Third Class (E–4), U.S. Navy.**

**NMCM 85 2165C.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 23 Feb. 1985.

Decided 28 Oct. 1986.

LTCOL Richard E. Ouellette, USMC, Appellate Defense Counsel.

LT J. Cunyon Gordon, JAGC, USN, Appellate Defense Counsel.

LT Linda P. McIntyre, JAGC, USNR, Appellate Government Counsel.

En Banc.

GLADIS, Judge:

Contrary to his pleas at a general court-martial bench trial, the accused was found guilty by exceptions and substitutions of a single charge and specification of larceny of numerous items of military property of a total value of $904.18, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. section 921, and sentenced to a bad-conduct discharge, confinement at hard labor for 9 months, total forfeitures, and reduction to pay grade E–1. A substitute convening authority approved the sentence. A divided panel of this Court reversed the findings and sentence and dismissed the Charge. The Court, on its own motion, ordered *en banc* reconsideration of the panel decision.

The issue presented by this appeal is whether certain evidence was the fruit of a lawful inspection or an illegal search. Finding a lawful inspection, we affirm.

At trial, defense counsel moved to suppress evidence seized during a brow inspection and other evidence derived from the inspection. Appellate Exhibit III. The accused was stopped when he was leaving the ship by a duty master-at-arms, Torpedoman's Mate Third Class Spate, who inspected the boxes the accused and two friends were carrying. Citing *United States v. Harris,* 5 M.J. 44 (C.M.A.1978), defense counsel argued that the evidence was inadmissible, because, although Spate inspected everyone who was leaving the ship, he and other members of the ship's master-at-arms force believed they had discretion as to whether to inspect the belongings of a particular individual depending on the traffic flow. Trial counsel replied that,

Spate's belief notwithstanding, he did not exercise discretion in determining whom to inspect and, therefore, the inspection was valid and the evidence admissible. Appellate Exhibit VI.

We find that the evidence establishes that it was normally the custom for the duty master-at-arms to inspect the property of everyone crossing the brow to depart the ship. The inspectors could vary the pattern and inspect every third or fourth person in order to facilitate the flow of traffic when a crowd was backing up. The inspectors and the junior officer of the deck (JOOD) who testified did not know the source of their authority. The command duty officer did not testify.

Finding that Spate exercised no discretion, but inspected the baggage and packages of every person crossing the brow in his watch, the military judge denied the motion.

Refusing to reach the discretion issue, a divided panel of this Court reversed because the record did not establish a delegation of command authority to working personnel.[1]

The ship's instruction in effect at the time of the inspection provided:

*Brow Inspections*

Any person and/or his accompanying property coming aboard shall be subject to administrative inspection upon entry.... The Command Duty Officer is authorized to order the inspection of all or a smaller percentage of our personnel crossing the brow, for example, every third, fifth, or seventh arriving or detaching person and to determine the periods of time during which these inspections will be held. On every day that our command is in port, the Command Duty Officer, upon assuming the duty, will establish an inspection schedule for the period of his watch.

In *United States v. Harris*, 5 M.J. at 66, the Court of Military Appeals held that the stop of a vehicle at the gate for the purpose of search was unreasonable and the evidence obtained as a result inadmissible because the law enforcement officer involved in the operation was permitted to exercise discretion concerning important aspects of the procedure. The majority stated that although the use of gate searches to deter persons from introducing contraband onto a military installation was eminently reasonable, to insure the least possible intrusion into the constitutionally protected area, and thereby preserve freedom from unreasonable invasions of personal privacy, a procedure must be employed which completely removes discretion from persons engaged in law enforcement activities. *Id.* at 65. The majority found a misemployment of the inspection power that was *per se* unreasonable and constitutionally defective because the base commander failed to ensure proper control of the intrusion into constitutional protections for the servicemember. *Id.* at 66 (Fletcher, C.J., concurring).

Subsequently, in *United States v. Middleton*, 10 M.J. 123, 128 (C.M.A.1981), the Court narrowed the rights of military personnel, concluding that during a traditional military inspection no serviceperson whose area is subject to the inspection may reasonably expect any privacy which will be protected from the inspection. The Court noted, however, that care must be taken that the circumstances of the inspection not be unreasonable. *Id.* at n. 10. It held that evidence located in the course of a military inspection is admissible when safeguards are present which assure that the inspec-

---

1. The defense did not challenge the lack of evidence of delegation of authority at trial, but contended the search was illegal because too much discretion was exercised by the inspectors. The panel majority admitted that such evidence might exist. Under the circumstances the accused should not be permitted to challenge the admissibility of the evidence in question on grounds that he raises for the first time on appeal. *United States v. Marsh*, 9 M.J. 870 (NCMR 1980). We need not invoke the doctrine of waiver, however, because our analysis reveals that the record establishes a lawful search. This case is distinguishable from *United States v. Hayes*, 11 M.J. 249 (C.M.A.1981), in which no evidence of regulations, standard operating procedure, or command policy was introduced.

tion was really intended to determine and assure the readiness of the unit inspected, rather than merely to provide a subterfuge for avoiding limitations that apply to a search and seizure in a criminal investigation. *Id.* at 131, 132.

Military Rule of Evidence (Mil.R.Evid.) 313(b), as amended, which took effect after *Middleton* was decided and is applicable to the inspection in the case before us, provides:

An "inspection" is an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle. An inspection may include but is not limited to an examination to determine and to ensure that any or all of the following requirements are met: that the command is properly equipped, functioning properly, maintaining proper standards of readiness, sea or airworthiness, sanitation and cleanliness, and that personnel are present, fit, and ready for duty. An inspection also includes an examination to locate and confiscate unlawful weapons and other contraband. An order to produce body fluids, such as urine, is permissible in accordance with this rule. An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule. If a purpose of an examination is to locate weapons or contraband, and if: (1) the examination was directed immediately following a report of a specific offense in the unit, organization, installation, vessel, aircraft, or vehicle and was not previously scheduled; (2) specific individuals are selected for examination;

or (3) persons examined are subjected to substantially different intrusions during the same examination, the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule. Inspections shall be conducted in a reasonable fashion and shall comply with Mil.R.Evid. 312, if applicable. Inspections may utilize any reasonable natural or technological aid and may be conducted with or without notice to those inspected. Unlawful weapons, contraband, or other evidence of crime located during an inspection may be seized.

■ The prohibition in *Harris* against the exercise of absolutely any discretion by law enforcement personnel in conducting command authorized inspections has been virtually overruled by *Middleton*.[2] The rule in *Harris* was adopted to protect a court-perceived constitutional right of military personnel to be safe from intrusive inspections, a right that the Court in *Middleton* found military personnel do not possess. The procedures mandated by *Harris* for a gate inspection were not adopted by the drafters of Mil.R.Evid. 313(b). An inspection is reasonable and lawful as long as it is not a subterfuge for a search for criminal evidence. *United States v. Middleton*, 10 M.J. 123; Mil.R.Evid. 313(b).

■ The inspection of the accused's property in the case before us was a reasonable and lawful inspection sanctioned by Mil.R.Evid. 313(b) and the commanding officer's instruction on brow inspections. It was an examination at an exit point to locate contraband. Clearly it was not a subterfuge for a search for criminal evidence. It was not directed immediately following the report of a specific offense; it did not select specific individuals for examination; and it did not subject military personnel examined to substantially different intrusions during the same examina-

---

2. Of course Torpedoman's Mate Third Class Spate did not exercise any discretion but inspected everyone departing the ship on his watch. The fact that earlier watchstanders may not have inspected everyone when traffic backed up is not relevant.

tion.[3] The inspection was also conducted in accordance with established custom. It was part of the ship's routine under the aegis of the JOOD, the command representative, who was present.[4] Thus, it was, in effect a scheduled command inspection. No unlawful discretion was exercised by the inspector.

On reconsideration, finding that the challenged evidence was the fruit of a reasonable and lawful inspection, we set aside the panel decision. The findings of guilty and sentence as approved on review below are affirmed.

Chief Judge GORMLEY, and Judges COUGHLIN, RILEY, MITCHELL, CASSEL, MIELCZARSKI and DECARLO concur.

Judge GRANT absent.

---

**3.** Such factors, not present here, will not necessarily invalidate an inspection. Mil.R.Evid. 313(b).

**4.** The command duty officer does not stand a watch on the enlisted brow.